JS 44   (Rev. 02/19)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law,  except as provided by local rules of court.  This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet.   *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a)  PLAINTIFFS

AMY BROWN

**(b)**  County of Residence of First Listed Plaintiff   Chester County
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)**  Attorneys *(Firm Name, Address, and Telephone Number)*
Julie A. Uebler, Esquire
Console Mattiacci Law, LLC
1525 Locust Street, 9th Fl., Philadelphia, PA 19102

## DEFENDANTS

AMETEK, INC.

County of Residence of First Listed Defendant
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF
THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
Susan K. Lessack, Esquire
Pepper Hamilton LLP
400 Berwyn Park
899 Cassatt Road, Berwyn, PA 19312-1183

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

☐ 1   U.S. Government
Plaintiff

☒ 3   Federal Question
*(U.S. Government Not a Party)*

☐ 2   U.S. Government
Defendant

☐ 4   Diversity
*(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*                                          *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV.  NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | of Property 21 USC 881 | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | ☐ 690 Other | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 835 Patent - Abbreviated | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | New Drug Application | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | | ☐ 840 Trademark | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | **LABOR** | **SOCIAL SECURITY** | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 485 Telephone Consumer |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | Act | ☐ 862 Black Lung (923) | Protection Act |
| ☐ 190 Other Contract | Product Liability | ☐ 380 Other Personal | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 490 Cable/Sat TV |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | Relations | ☐ 864 SSID Title XVI | ☐ 850 Securities/Commodities/ |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | Exchange |
| | ☐ 362 Personal Injury - | Product Liability | ☐ 751 Family and Medical | | ☐ 890 Other Statutory Actions |
| | Medical Malpractice | | Leave Act | | ☐ 891 Agricultural Acts |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | ☐ 791 Employee Retirement | ☐ 870 Taxes (U.S. Plaintiff | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | Income Security Act | or Defendant) | Act |
| ☐ 230 Rent Lease & Ejectment | ☒ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | Agency Decision |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | State Statutes |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

☒ 1   Original
Proceeding

☐ 2   Removed from
State Court

☐ 3   Remanded from
Appellate Court

☐ 4   Reinstated or
Reopened

☐ 5   Transferred from
Another District
*(specify)*

☐ 6   Multidistrict
Litigation -
Transfer

☐ 8   Multidistrict
Litigation -
Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 U.S.C. § 2000e, et seq.; and 43 P.S. § 951, et seq.
Brief description of cause:
Gender Discrimination and Retaliation

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION**
UNDER RULE 23, F.R.Cv.P.

**DEMAND $**
in excess of 150,000.00

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*

JUDGE _____   DOCKET NUMBER _____

DATE   3/11/2020

SIGNATURE OF ATTORNEY OF RECORD   *Julie A. Uebler*

## FOR OFFICE USE ONLY

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

**DESIGNATION FORM**
*(to be used by counsel or pro se plaintiff to indicate the category of the case for the purpose of assignment to the appropriate calendar)*

Address of Plaintiff: _____ 512 Downing Court, Exton, PA 19341

Address of Defendant: _____ 1100 Cassatt Road, Berwyn, PA 19312

Place of Accident, Incident or Transaction: _____ 1100 Cassatt Road, Berwyn, PA 19312

---

**RELATED CASE, IF ANY:**

Case Number: _____ Judge: _____ Date Terminated: _____

Civil cases are deemed related when *Yes* is answered to any of the following questions:

1. Is this case related to property included in an earlier numbered suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

2. Does this case involve the same issue of fact or grow out of the same transaction as a prior suit pending or within one year previously terminated action in this court?  Yes ☐  No ☑

3. Does this case involve the validity or infringement of a patent already in suit or any earlier numbered case pending or within one year previously terminated action of this court?  Yes ☐  No ☑

4. Is this case a second or successive habeas corpus, social security appeal, or pro se civil rights case filed by the same individual?  Yes ☐  No ☑

I certify that, to my knowledge, the within case ☐ is / ☑ is not related to any case now pending or within one year previously terminated action in this court except as noted above.

DATE: 3/11/2020 _____ _____ 71297

*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

---

**CIVIL: (Place a √ in one category only)**

**A.** *Federal Question Cases:*

- ☐ 1. Indemnity Contract, Marine Contract, and All Other Contracts
- ☐ 2. FELA
- ☐ 3. Jones Act-Personal Injury
- ☐ 4. Antitrust
- ☐ 5. Patent
- ☐ 6. Labor-Management Relations
- ☐ 7. Civil Rights
- ☐ 8. Habeas Corpus
- ☐ 9. Securities Act(s) Cases
- ☐ 10. Social Security Review Cases
- ☑ 11. All other Federal Question Cases
  *(Please specify):* 42 U.S.C. § 2000e, et seq.; 43 P.S. § 951, e

**B.** *Diversity Jurisdiction Cases:*

- ☐ 1. Insurance Contract and Other Contracts
- ☐ 2. Airplane Personal Injury
- ☐ 3. Assault, Defamation
- ☐ 4. Marine Personal Injury
- ☐ 5. Motor Vehicle Personal Injury
- ☐ 6. Other Personal Injury *(Please specify):* _____
- ☐ 7. Products Liability
- ☐ 8. Products Liability – Asbestos
- ☐ 9. All other Diversity Cases
  *(Please specify):* _____

---

**ARBITRATION CERTIFICATION**
*(The effect of this certification is to remove the case from eligibility for arbitration.)*

I, _____ Julie A. Uebler _____, counsel of record *or* pro se plaintiff, do hereby certify:

☑ Pursuant to Local Civil Rule 53.2, § 3(c) (2), that to the best of my knowledge and belief, the damages recoverable in this civil action case exceed the sum of $150,000.00 exclusive of interest and costs;

☒ Relief other than monetary damages is sought.

DATE: 3/11/2020 _____ _____ 71297

*Attorney-at-Law / Pro Se Plaintiff* _____ *Attorney I.D. # (if applicable)*

NOTE: A trial de novo will be a trial by jury only if there has been compliance with F.R.C.P. 38.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

### CASE MANAGEMENT TRACK DESIGNATION FORM

| | | |
|---|---|---|
| AMY BROWN | : | CIVIL ACTION |
| v. | : | |
| AMETEK, INC. | : | |
| | : | NO. |

In accordance with the Civil Justice Expense and Delay Reduction Plan of this court, counsel for plaintiff shall complete a Case Management Track Designation Form in all civil cases at the time of filing the complaint and serve a copy on all defendants. (See § 1:03 of the plan set forth on the reverse side of this form.) In the event that a defendant does not agree with the plaintiff regarding said designation, that defendant shall, with its first appearance, submit to the clerk of court and serve on the plaintiff and all other parties, a Case Management Track Designation Form specifying the track to which that defendant believes the case should be assigned.

## SELECT ONE OF THE FOLLOWING CASE MANAGEMENT TRACKS:

(a) Habeas Corpus – Cases brought under 28 U.S.C. § 2241 through § 2255. ☐

(b) Social Security – Cases requesting review of a decision of the Secretary of Health and Human Services denying plaintiff Social Security Benefits. ☐

(c) Arbitration – Cases required to be designated for arbitration under Local Civil Rule 53.2. ☐

(d) Asbestos – Cases involving claims for personal injury or property damage from exposure to asbestos. ☐

(e) Special Management – Cases that do not fall into tracks (a) through (d) that are commonly referred to as complex and that need special or intense management by the court. (See reverse side of this form for a detailed explanation of special management cases.) ☐

(f) Standard Management – Cases that do not fall into any one of the other tracks. ☑

| 3/11/2020 | Julie A. Uebler | Plaintiff |
|---|---|---|
| **Date** | **Attorney-at-law** | **Attorney for** |
| 215-545-7676 | 215-501-5957 | uebler@consolelaw.com |
| **Telephone** | **FAX Number** | **E-Mail Address** |

(Civ. 660) 10/02

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMY BROWN, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION NO. |
| | : | |
| | : | |
| | : | |
| AMETEK, INC., | : | |
| | : | JURY TRIAL DEMANDED |
| Defendant. | : | |
| | : | |
| | : | |

## COMPLAINT

Plaintiff, Amy Brown ("Plaintiff"), by and through her counsel, files this Complaint and asserts claims of gender discrimination and retaliation against AMETEK, Inc. ("Defendant" or "AMETEK").

## INTRODUCTION

AMETEK is a global multi-billion-dollar manufacturing company based in Berwyn, Pennsylvania. AMETEK's senior management team, which is comprised solely of white men, claims to be interested in improving the diversity of its workforce, including the hiring, promotion, and retention of women. Contrary to its purported interest in diversity, however, AMETEK's management team subjects their female employees to a gender-biased hostile work environment in which they are routinely passed over for promotion, and men receive preferential treatment.

Amy Brown was a dedicated, hardworking high potential female employee of AMETEK for more than ten (10) years until the Company's blatant gender discrimination and retaliation

forced her to resign to protect her health. Ms. Brown filed this lawsuit to hold AMETEK accountable for destroying her career because of her gender and in retaliation for her efforts to rectify her supervisors' discriminatory conduct.

<u>JURISDICTION AND VENUE</u>

1.      This action for gender discrimination and retaliation is authorized and instituted pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, <u>et seq</u>., as amended.

2.      This Court has original jurisdiction pursuant to 28 U.S.C. § 1331.

3.      This Court has supplemental jurisdiction with respect to Plaintiff's claims for gender discrimination and retaliation under the Pennsylvania Human Relations Act ("PHRA"), as amended, 43 P.S. § 951, <u>et seq.</u>, pursuant to 28 U.S.C. § 1367.

4.      This case is not subject to compulsory arbitration because Plaintiff seeks injunctive relief and the amount in controversy exceeds the jurisdictional amount for arbitration of One Hundred Fifty Thousand Dollars ($150,000), exclusive of interest and costs.

5.      Plaintiff has exhausted her administrative remedies with respect to her gender discrimination and retaliation claims pursuant to Title VII and PHRA since more than one (1) year has passed since she filed an administrative complaint on January 8, 2019. Such administrative complaint was filed with the Pennsylvania Human Relations Commission ("PHRC"), and was dual filed with the Equal Employment Opportunity Commission ("EEOC"). Attached hereto, incorporated herein, and marked as "Exhibit 1" is a true and correct copy of the PHRC administrative complaint (with personal identifying information redacted).

6.      The EEOC issued a Notice of Right to Sue on February 14, 2020. Attached hereto, incorporated herein, and marked as "Exhibit 2" is a true and correct copy of that Notice.

7.     Venue is properly invoked pursuant to 29 U.S.C. § 1391(b) because the actions complained of herein occurred within the jurisdictional limit of this Court.

PARTIES

8.     Amy Brown is a female citizen of the United States who resides in Exton, Pennsylvania.

9.     AMETEK identifies itself as a leading global manufacturer of electronic instruments and electromechanical devices.

10.    AMETEK is a publicly traded company that generates annual sales in excess of $5 billion, and employs over 18,000 employees in 30 different countries.

11.    AMETEK's corporate headquarters is located at 1100 Cassatt Road, Berwyn, PA 19312.

12.    At all times relevant to this Complaint, AMETEK has had at least fifteen (15) employees, and has been an employer engaged in an industry affecting commerce within the meaning of Section 701(b), (g) and (h) of Title VII.

13.    At all times relevant to this Complaint, AMETEK was an employer within the meaning of the PHRA.

14.    At all times relevant to this Complaint, Ms. Brown was an employee of AMETEK within the meaning of Title VII and the PHRA.

15.    At all times relevant to this Complaint, Ms. Brown worked for AMETEK out of its headquarters office in Pennsylvania.

FACTUAL ALLEGATIONS

Amy Brown's Educational and Employment History Prior to AMETEK

16.     Ms. Brown graduated with honors with a Bachelor of Arts degree in Economics and Business Administration from Ursinus College. Ms. Brown was the first person in her family to obtain a college degree.

17.     Ms. Brown began her career as a Senior Auditor in the Philadelphia office of KPMG LLP, where she worked until June 2002.

18.     From July 2002 through March 2004, Ms. Brown worked for ViroPharma Incorporated in Exton, Pennsylvania, as an Accounting Specialist.

19.     To advance her career, Ms. Brown accepted a job as a Senior Accounting Analyst for Cephalon, Inc. in Frazer, Pennsylvania, a position she held from March 2004 through July 2005.

20.     Cephalon promoted Ms. Brown to Manager, External Accounting in August 2005, and to Senior Manager, External Reporting in July 2007.

21.     In an effort to advance her career and expand her opportunities for growth, Ms. Brown sought employment at AMETEK, which was a larger, more established public company.

Amy Brown's Stellar Work History at AMETEK

22.     AMETEK hired Ms. Brown as Manager, External Reporting, effective March 17, 2008.

23.     Throughout her career to that point, Ms. Brown had achieved all the goals she had set for herself through hard work, technical skills, ambition, and the ability to lead and influence her colleagues.

4

24.     As Manager, External Reporting, Ms. Brown reported to Jeff Stevens, Director, Financial Reporting, in the Finance Department.

25.     Over the next couple of years, AMETEK praised Ms. Brown's performance and expanded her job responsibilities.

26.     AMETEK promoted Ms. Brown to Senior Manager, External Reporting, effective April 1, 2011, in recognition of her skills and hard work.

27.     At the same time, AMETEK promoted Robert Virelli to Senior Manager, Technical Accounting.

28.     Mr. Virelli also reported to Mr. Stevens, and began his employment with AMETEK in late 2006.

29.     In or about 2012, as reported to Ms. Brown by Mr. Stevens, Mr. Stevens recommended to his (then) supervisor, Bob Mandos, Senior Vice President and Comptroller, that she be considered as his successor, rather than Mr. Virelli.

30.     For the next several years, Ms. Brown continued to meet or exceed all of her performance objectives.

AMETEK's Gender-Biased Work Environment

31.     Throughout Ms. Brown's employment, AMETEK treated male employees better than female employees, including Ms. Brown.

32.     For example, Mr. Stevens routinely interrupted Ms. Brown and/or spoke for her in group meetings, even when she was called on by name to answer questions. Mr. Stevens did not engage in the same behavior with male subordinates.

33.     Mr. Stevens also routinely spent more time with male employees, and rarely acknowledged or greeted female employees unless he needed something.

5

34.     Mr. Stevens frequently commented: "well, you know how you women are."

35.     Mr. Stevens routinely spoke disparagingly about his wife.

36.     When Ms. Brown asked Mr. Stevens for approval to attend an Executive Leadership Institute for Women, Ms. Stevens responded: "go ahead and do your women's thing."

37.     When Ms. Brown participated in the Company's "mandatory" unconscious bias training, Mr. Stevens told her that he did not have time for "stupid shit" like the training, which he told Human Resources he refused to take.

38.     When a female colleague in the Finance Department resigned, Mr. Stevens said it was due to "mother's guilt" because she could not "handle working and taking care of her kids."

Brown's Efforts to Advance Her Career And AMETEK's Refusal to Promote Her

39.     In 2014, Ms. Brown began proactively seeking additional career advancement opportunities at AMETEK, including monitoring all job openings posted at AMETEK.

40.     AMETEK's practice was to reward performance and recognize expanded job responsibilities with "in-role" promotions to the next level.

41.     In June 2014, Ms. Brown expressly identified the goal of being promoted from Senior Manager to Director of Financial Reporting in her 2014 Self Development Survey, a form required annually by AMETEK.

42.     For the 2015 Self Development Survey, Ms. Brown again identified the goal of a promotion to Director of Financial Reporting, or a promotion to Director, HR Executive Compensation, if available.

43.     Upon information and belief, AMETEK ignored Ms. Brown's expressed interest in promotional opportunities. To her knowledge, AMETEK took no actions to support Ms. Brown in her efforts to advance her career.

44.     In early September 2015, Ms. Brown requested a meeting with William (Bill) Burke, then Senior Vice President and Comptroller, to discuss development opportunities. Ms. Brown advocated for a promotion based on the significant expansion in her workload due to AMETEK's numerous acquisitions. Ms. Brown also suggested that she be considered for the Director, Executive Compensation role if it ever opened up. Although Mr. Burke acknowledged Ms. Brown's expanded responsibilities, he discounted her chances of promotion to Director and made no specific suggestions about how to position herself other than to "look around" for projects to get involved in.

45.     At the meeting with Mr. Burke, Ms. Brown also asked about the possibility of hiring a direct report so that she would have the capacity to take on additional projects, but Mr. Burke was not open to her request.

46.     In 2015, AMETEK conducted a "Diversity & Inclusion" survey as part of its alleged efforts to "attract and retain the best employees" across the company.

47.     According to the AMETEK Diversity & Inclusion survey results that were delivered as an update to the Board of Directors on November 3, 2015, the Company's workforce reflected a significant gender imbalance at all levels of management: (1) out of 1302 employees at the level of Supervisor and above, 81% were male and only 19% were female; (2) out of the 390 employees at the level of Director and above, 90% were male and only 10% were female; and (3) out of 165 employees at the level of Vice President or above, 94% were male and only 6% were female.

48.     According to the same update to the Board, 23% of survey respondents reported personally observing harassment or discrimination in the workplace and 15% reported that they had personally been a victim of harassment or discrimination.

49.     Despite these alarming results, AMETEK's executive team reported to the Board of Directors that the survey responses overall reflected a "positive view of diversity" at the Company.

50.     As a result of the diversity survey, AMETEK identified several recommendations, including a focus on improving the representation of women in management through, among other initiatives, developing a mentoring program for high potential women and establishing an Employee Resource Group for women.

51.     As of May 2016, Mr. Burke was promoted to Chief Financial Officer ("CFO"), and Mr. Stevens reported to Thomas Montgomery, who was promoted to Senior Vice President and Comptroller.

52.     On June 16, 2016, AMETEK held a Corporate Communications Meeting at which it announced certain promotions, including Mr. Burke's promotion to CFO, and provided an overview of the current management structure. The organization chart of the management team at the time contained only men.

53.     During the meeting, Eida Green (Black female), who worked in Global Procurement, asked about the prospects for promoting women in light of the makeup of the management team as reflected in the organization chart.

54.     Upon information and belief, Ms. Green's question was not well received by the male management team, and she thereafter suffered retaliatory harassment.

55.     In August 2016, AMETEK again delivered a glowing performance review to Ms. Brown for the prior year, yet the Company was unwilling to recognize and reward her efforts with a promotion to Director.

56.     At the same time it refused to support career advancement opportunities for its high potential female employees, including Ms. Brown, AMETEK's Human Resources leaders claimed to be focused on improving the hiring and promotion of women across the company.

57.     On November 22, 2016, Greg Kelble, Senior Vice President, Human Resources, sent an e-mail to women leaders confirming that it was "clear to [him] that [the company] can do better than [it has] been in hiring and promoting women in AMETEK across the globe." In the same e-mail, Mr. Kelble stated his intention to sponsor an Employee Resource Group for women.

58.     By January 2017, Mr. Kelble confirmed that no action would take place with respect to the Employee Resource Group for women until at least April due to other priorities.

AMETEK's Gender-Based Pay Disparity

59.     In 2015, when they were both Senior Managers, Ms. Brown and Mr. Virelli both sought increases in their annual base salaries because recent reductions in short term incentive payments had resulted in a decrease to their net pay.

60.     Upon information and belief, AMETEK increased Mr. Virelli's base salary by $10,000 in the Spring of 2015. Ms. Brown received no similar increase, even though she and Mr. Virelli were similarly situated and had both been advocating for raises.

61.     AMETEK's decision to increase Mr. Virelli's pay, and not Ms. Brown's pay, even though they were both Senior Managers reporting to the same supervisor, and both presented the same business rationale, was motivated by gender bias.

9

62.     Shortly thereafter, Ms. Brown met with Mr. Burke directly to request a pay raise, which was granted approximately six (6) months after Mr. Virelli's annual salary increase.

63.     Upon information and belief, AMETEK issued equity compensation to Mr. Virelli and/or other male Senior Managers at a higher value than the grants made to Ms. Brown because of gender bias.

<u>Brown's Renewed Efforts to Advance Her Career in 2017 And AMETEK's Continue Refusal to Promote Her Despite Its Stated Goals to Improve Gender Diversity In Management</u>

64.     In May 2017, Ms. Brown approached Mr. Montgomery to discuss the potential for a promotion to Director in light of her consistent excellent performance and results. Mr. Montgomery stated that she was a valuable member of the Finance Department, but otherwise took no steps to assist with her career advancement.

65.     In her 2017 Self Development Survey submitted in August 2017, Ms. Brown expressly requested a development plan geared towards preparing her for promotion to Director. Ms. Brown outlined her expanding work responsibilities, and her specific efforts to develop her exposure to the Company's executives. No one from AMETEK even acknowledged her proposal or development goals.

66.     In the wake of two Director-level promotion announcements in other departments in December 2017, Ms. Brown again approached Mr. Montgomery about her status. Mr. Montgomery refused to address her concerns, saying only that he could not speak to what was happening in other departments.

67.     In February 2018, Ms. Brown received a memorandum from Mr. Burke, Mr. Montgomery, and Mr. Stevens praising her work on the 2017 year-end financial closing process.

10

68.     Also, in February 2018, AMETEK's Human Resources Department extended an invitation to Ms. Brown confirming that she had been nominated to attend a corporate leadership development program. Ms. Brown attended the two-day program in March 2018.

69.     Upon information and belief, Ms. Brown's peer, Rob Virelli, was also invited to attend the leadership training, but he did not attend at that time.

AMETEK'S Promotion of Virelli, but not Brown, to Director

70.     Early in the day on April 17, 2018, Ms. Brown learned that AMETEK had promoted Mr. Virelli to Director when she saw it identified on his email profile.

71.     Ms. Brown took a screen shot of Mr. Virelli's profile, and when she ran into Mr. Montgomery, asked if she could speak to him.

72.     In a meeting that morning, Mr. Montgomery confirmed Mr. Virelli had been promoted from Senior Manager to Director within his own role, Technical Accounting.

73.     A promotion from Senior Manager to Director includes significant increases in: base pay; the target for short term incentive compensation as a percentage of base pay; the number and value of long-term incentive grants; as well as eligibility for perquisites, such as a company car and company-paid cell phone.

74.     When Ms. Brown asked about her own promotion opportunity, Mr. Montgomery became defensive and indicated only that Mr. Virelli "deserved" it. Mr. Montgomery refused to discuss Ms. Brown's eligibility for promotion, and only said they would "see how things go."

75.     Following the discussion with Mr. Montgomery, Ms. Brown felt sick and could not concentrate on her work. Ms. Brown e-mailed Mr. Stevens to let him know she was going home sick.

76.     Later that day, when Mr. Montgomery learned that Ms. Brown left because she felt sick, he told Mr. Stevens to "get her back in here."

77.     Mr. Stevens invited Ms. Brown out to lunch the next day, on April 18, 2018. During that lunch, Mr. Stevens told Ms. Brown that when he saw the paperwork come through for Mr. Virelli's promotion to Director, he advocated for her to be promoted as well, but Mr. Montgomery and Mr. Burke took no action on his recommendation.

78.     Mr. Stevens also told Ms. Brown that she deserved a promotion more than Mr. Virelli in light of her superior work product, the volume of work she accomplished, and the confidential and high-profile nature of her work.

79.     Based on AMETEK's promotion of a less-qualified male to Director, Ms. Brown reasonably believed that the Finance Department refused to promote her to Director despite her many years of excellent and dedicated service because of her gender.

80.     In late April 2018, Ms. Brown sought medical treatment for the anxiety and depression she suffered as a result of AMETEK's gender-biased work environment and its discriminatory failure to promote her.

Brown's Complaint of Gender Discrimination and AMETEK's Retaliatory Response

81.     On April 30, 2018, Ms. Brown met with Gina Alm-Myers, Director of Corporate Human Resources, for guidance and support with respect to her advancement opportunities at AMETEK.

82.     During the meeting with Ms. Alm-Myers, Ms. Brown explained her prior efforts to obtain a promotion, and her frustration that a male peer, Mr. Virelli, had been promoted, but she had not.

83.     Ms. Brown told Ms. Alm-Myers that she did not understand what more she needed to do in order to be promoted, particularly given her positive performance assessments, her consistently expanding workload, and her strong work ethic.

84.     Ms. Alm-Myers seemed interested and supportive at first, but then it became clear to Ms. Brown that Ms. Alm-Myers could not or would not assist her to address the situation.

85.     When Ms. Brown mentioned that she had been explicitly seeking a promotional opportunity since completing her 2014 Self Development Survey, and she did not know how those forms were processed, Ms. Alm-Myer admitted that she had seen Ms. Brown's requests, but took no actions to assist.

86.     Ms. Brown also pointed out that AMETEK was actively communicating about wanting to increase gender diversity in hiring and retention, including in a recent recruiting video, and said: "I want to be retained."

87.     In response, Ms. Alm-Myers told Ms. Brown that she was coming off as "too demanding," that she needed to "soften" her delivery and be "more open." Ms. Alm-Myer added: "You know how they are around here."

88.     Ms. Alm-Myers told Ms. Brown that she had been meeting with Mr. Burke monthly, and was aware that Ms. Brown had "walked out" of work recently. Ms. Brown corrected Ms. Alm-Myers to confirm that she did not walk out, but had gone home sick.

89.     Although she claimed to have heard and understood Ms. Brown's concerns, Ms. Alm-Myers simply suggested that Ms. Brown take up the issue with Mr. Stevens again.

90.     Since it seemed that Mr. Stevens did not have either the intent or the authority to influence the situation, Ms. Brown asked Ms. Alm-Myers if she would be willing to champion the issue of her career development with Mr. Burke and Mr. Montgomery.

13

91.     Rather than address the blatant gender bias in the Finance Department's promotion of Mr. Virelli and not Ms. Brown, Ms. Alm-Myers told Ms. Brown that Mr. Burke and Mr. Montgomery may "react badly" if she stepped in. Instead, Ms. Alm-Myers suggested that Ms. Brown meet with Mr. Burke to address her concerns.

92.     Other than stopping by Ms. Brown's office a few weeks later to ask – from the doorway - how she was doing, Ms. Alm-Myers took no steps to address Ms. Brown's complaint of gender discrimination.

<u>AMETEK's Discriminatory and Retaliatory Refusal to Consider Brown For The Open Director, Executive Compensation Position</u>

93.     In or about early summer 2018, the former Director, Executive Compensation exited the Company leaving an open position reporting to Matthew Conti, the Vice President of Human Resources.

94.     The Director, Executive Compensation position was the role Ms. Brown had proposed to Mr. Burke as an alternative career path when she met with him back in 2015.

95.     On or about July 31, 2018, Ms. Brown communicated to both Mr. Stevens and Mr. Montgomery that she was interested in seeking the open position of Director, Executive Compensation. As part of those discussions, Ms. Brown provided a written outline of her current responsibilities, metrics to quantify how her responsibilities had grown since she was hired 10 years prior, and a list of the special projects she had completed over the prior three years.

96.     Ms. Brown was more than qualified for the Director, Executive Compensation position.

97.     In response to her stated interest in the Director, Executive Compensation position, which was never posted, Mr. Montgomery discouraged her from considering it and said Mr. Conti was "going in a different direction" with the position.

98.     In early September 2018, Ms. Brown met with Mr. Stevens to discuss her eligibility for promotion. According to Mr. Stevens, the "message" (from Mr. Burke and Mr. Montgomery) was that her "work and effort" were not at the Director level, and she needed more exposure to the Company's executive officers to be promoted.

99.     AMETEK's statements about Ms. Brown's promotability were just a pretext for gender discrimination and/or retaliation. Throughout her employment at AMETEK, Ms. Brown had significant and regular exposure to the Company's executives, including with respect to the preparation of the annual and quarterly reports, earnings releases and related scripts, and equity award accounting and disclosures.

100.    In apparent recognition that Ms. Brown's career advancement at AMETEK was futile, Mr. Stevens offered to "make up" some developmental assignments for Ms. Brown, but cautioned that they would only be his suggestions, and would not be anything approved by Mr. Burke or Mr. Montgomery. Ms. Brown declined his offer.

101.    Less than a week later, on September 10, 2018, AMETEK announced that it had hired Todd Henderson (male), an external candidate, as Director, Executive Compensation.

102.    AMETEK's decision to hire Mr. Henderson instead of Ms. Brown for the Director, Executive Compensation position was motivated by gender discrimination and retaliation.

<u>Brown Suffers Debilitating Anxiety and Depression As a Result of AMETEK's Discrimination and Retaliation</u>

103.    Ms. Brown was aware that Tina van Zyl, a female Senior Tax Manager in the Finance Department, had also been seeking a promotion to Director.

15

104.    According to Ms. van Zyl, her supervisor, David Frank, Vice President, Taxation, advised her that he did not have authority to promote any of the Senior Managers in the Tax function to Director.

105.    Upon information and belief, Ms. van Zyl resigned her position at AMETEK because she had no career advancement opportunities.

106.    Not long after Ms. van Zyl's resignation, on October 2, 2018, AMETEK announced that Mark Mango, a Senior Tax Manager and Ms. van Zyl's male peer, had been promoted to Corporate Director, International Taxation.

107.    In early September 2018, Jennifer Collins, a Manager reporting to Mr. Stevens, resigned her employment without another job offer.

108.    About a month later, on October 9, 2018, Ms. Collins returned to AMETEK as a consultant to assist Ms. Brown with financial reporting obligations. That day, Ms. Collins shared that she left because of the very difficult work environment created by both Mr. Stevens and Mr. Virelli. Ms. Collins also told Ms. Brown that she was appalled at the way Ms. Brown was being treated by her male colleagues, including the volume of work she was assigned for no credit, and the way in which they spoke to her.

109.    Following AMETEK's refusal to consider her for the Director, Executive Compensation position, the Finance Department's promotion of yet another male employee (Mark Mango) to Director, and her discussions with Ms. Collins about gender bias in the work environment, Ms. Brown suffered panic attacks in addition to anxiety and depression.

110.    Later that month, Ms. Brown's physician prescribed anti-anxiety and anti-depressant medication, and referred her to a therapist.

16

111.    Despite her symptoms of anxiety and depression, Ms. Brown continued to deliver excellent work product for several more months.

112.    In mid-December 2018, Ms. Brown facilitated the Management's Discussion and Analysis calls attended by Mr. Burke, Mr. Montgomery and Mr. Virelli, as well as other male members of the Finance Department. This was a multi-day set of conference calls in which the Finance leaders worked with the Controllers in the field to review quarterly financial reports.

113.    Consistent with their past behavior, Mr. Burke and Mr. Montgomery challenged the female Controllers more often than the male Controllers during the conference call.

114.    At the end of the conference call on December 12, 2018, Mr. Montgomery asked what time the next day's meeting started. Ms. Brown replied: 9:00 am. Mr. Montgomery said he thought Ms. Brown told him previously that the meeting would start at 8:30 am. Ms. Brown said: No, that's when Friday's meeting starts.

115.    In response, Mr. Burke laughed and stated that this was "like when your wife tells you an earlier time to be ready when you are planning on going out as she does not want you to be late." The men laughed along with Mr. Burke. Ms. Brown was the only woman in the room.

116.    By that point, the emotional distress from AMETEK's discriminatory and retaliatory conduct was interfering with Ms. Brown's ability to work, and she sought a medical leave of absence.

117.    On January 8, 2019, Ms. Brown filed an administrative complaint of gender discrimination and retaliation with the Pennsylvania Human Relations Commission.

118.    No one from AMETEK contacted Ms. Brown to investigate her complaint or address her concerns.

17

119.    AMETEK approved Ms. Brown's unpaid medical leave of absence from December 17, 2018 through May 10, 2019, and expected her to return to work on May 13, 2019.

120.    As a result of AMETEK's discriminatory and retaliatory conduct, and the gender-based and retaliatory hostile work environment, Ms. Brown reasonably believed that returning to work at AMETEK would jeopardize her health.

121.    Ms. Brown submitted her resignation at the end of her medical leave, effective May 10, 2019.

122.    If not for AMETEK's discriminatory and retaliatory conduct, Ms. Brown would not have resigned her employment.

123.    As a direct and proximate result of AMETEK's gender biased and retaliatory actions, Ms. Brown has incurred, and continues to incur, a loss of earnings and/or earning capacity, pain and suffering, embarrassment, humiliation, loss of self-esteem, mental anguish, and loss of life's pleasures.

124.    AMETEK's gender biased and retaliatory actions were willful and implemented with malice and/or a reckless disregard for Ms. Brown's civil rights and warrant the imposition of punitive damages.

COUNT I

Gender Discrimination in violation of
Title VII of the Civil Rights Act of 1964

125.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

126.    AMETEK violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, by subjecting Plaintiff to a gender-biased hostile work environment.

127.     AMETEK violated Title VII by treating Plaintiff differently than similarly situated male employees with respect to the terms and conditions of her employment because of her gender, including but not limited to her compensation and opportunities for career advancement.

128.     AMETEK violated Title VII by refusing to promote Plaintiff to Director because of her gender while promoting and/or hiring similarly situated male employees or applicants as Directors.

COUNT II

Retaliation in violation of
Title VII of the Civil Rights Act of 1964

129.     Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

130.     AMETEK violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq., as amended, by subjecting Plaintiff to materially adverse actions following her good faith complaint of gender discrimination, including but not limited to, refusing to advance her career and/or to promote her to Director.

COUNT III

Gender Discrimination in violation of the
Pennsylvania Human Relations Act

131.     Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

132.     AMETEK violated the Pennsylvania Human Relations Action, 43 P.S. § 951, et seq., by subjecting Plaintiff to a gender-biased hostile work environment.

19

133.    AMETEK violated the PHRA by treating Plaintiff differently than similarly situated male employees with respect to the terms and conditions of her employment because of her gender, including but not limited to her compensation and opportunities for career advancement.

134.    AMETEK violated the PHRA by refusing to promote Plaintiff to Director because of her gender while promoting and/or hiring similarly situated male employees or applicants as Directors.

<u>COUNT IV</u>

Retaliation in violation of the
<u>Pennsylvania Human Relations Act</u>

135.    Plaintiff hereby incorporates by reference the foregoing paragraphs as though fully set forth herein.

136.    AMETEK violated Pennsylvania Human Relations Action, 43 P.S. § 951, et seq., by subjecting Plaintiff to materially adverse actions following her good faith complaint of gender discrimination, including but not limited to, refusing to advance her career and/or to promote her to Director.

<u>PRAYER FOR RELIEF</u>

WHEREFORE, Plaintiff, Amy Brown, respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendant as follows:

A.      Declaring the acts and practices complained of herein to be a violation of the Title VII of the Civil Rights Act of 1964;

B.      Declaring the acts and practices complained of herein to be a violation of the Pennsylvania Human Relations Act;

20

C.      Awarding to Plaintiff compensation for all past and future pecuniary losses resulting from Defendant's illegal actions, including but not limited to lost earnings, lost earnings growth potential, all compensation and benefits lost caused by the actions of Defendant, all out-of-pocket losses, as well as an award of front pay if employment with Defendant in the position of Director or above is not possible;

D.      Awarding to Plaintiff compensatory damages for all past and future non-pecuniary damages resulting from Defendant's illegal actions, including emotional upset, mental anguish, humiliation, pain and suffering, and loss of life's pleasures;

E.      Awarding to Plaintiff punitive damages for Defendant's malicious and reckless conduct as described herein;

F.      Awarding to Plaintiff all costs of this action, together with reasonable attorneys' fees;

G.      Awarding to Plaintiff prejudgment interest;

H.      Awarding to Plaintiff the sum necessary to make up for any adverse tax consequences incurred by her as result of any judgment entered in this matter; and

I.      Awarding to Plaintiff such additional relief as the Court deems just and proper under the circumstances.

<u>JURY TRIAL DEMANDED</u>

Plaintiff hereby requests a jury trial on each of the Counts in this Complaint.


CONSOLE MATTIACCI LAW, LLC


<u>s/ Julie A. Uebler</u>
Julie A. Uebler, Esquire (ID No. 71297)
1525 Locust Street, 9th Floor
Philadelphia, PA 19102
(215) 545-7676 (Voice)
(215) 501-5957 (Fax)
uebler@consolelaw.com

Attorneys for Plaintiff
Amy Brown

EXHIBIT 1

Received

JAN - 8 2019

PA Human Relations Commission
Philadelphia Regional Office

COMMONWEALTH OF PENNSYLVANIA
GOVERNOR'S OFFICE
PENNSYLVANIA HUMAN RELATIONS COMMISSION

## COMPLAINT

---

| | |
|---|---|
| COMPLAINANT: | : |
| | : |
| **AMY BROWN** | :    Docket No. |
| | : |
| v. | : |
| | : |
| RESPONDENT: | : |
| | : |
| **AMETEK, INC.** | : |

---

1.  The Complainant herein is:

    Name:      Amy Brown

    Address:    REDACTED


2.  The Respondent herein is:

    Names:      AMETEK, Inc.

    Address:    1100 Cassatt Road
                Berwyn, PA 19312

3.  I, Amy Brown, the Complainant herein, allege that I was subjected to unlawful

discrimination because of my sex (female) and retaliation because of my complaints of sex

discrimination, as set forth below:

### Discrimination and Retaliation

**A.  I specifically allege:**

[1]        I was hired by Respondent on or about March 17, 2008.

[2]        I am a current employee of Respondent.

[3]        I consistently perform my job duties in a highly competent manner and receive positive performance reviews.

[4]        I hold the position of Senior Manager, Financial Reporting.

[5]        I report to Jeffrey Stevens (male), Director, Accounting and Financial Reporting.  Stevens reports to Thomas Montgomery (male), Senior Vice President and Comptroller.  Montgomery reports to William Burke (male), Executive Vice President and Chief Financial Officer.

[6]        The employees that directly report to Stevens are the following: Robert Virelli (male), Director; Michael Gantz (male), Senior Manager; Laura Connolly (female), Manager; Leslie Miller (female), Manager; Matthew Molinelli (male), Senior Accountant; Carol Owens (female), Staff Accountant; and me (female), Senior Manager.  I am more qualified to do each of these employee's positions.

[7]        Respondent has treated male employees better, and in a more preferential manner, than Respondent treats me.

[8]        Respondent has treated me differently, and worse—and in a more hostile and dismissive manner—than Respondent treats male employees.

[9]        In group meetings, Stevens (male) interrupts me and/or speaks for me, even when I am called on by name to answer a question.

[10]       Stevens (male) routinely talks and spends time with male employees but rarely acknowledges or greets female employees.

[11]       Stevens (male) routinely speaks disparagingly about his wife.

[12]        Stevens (male) has frequently commented: "well, you know how you women are."

[13]        On one occasion, when Montgomery (male) asked me what a meeting started and I told him 9:00 am, Montgomery (male) stated that he thought I had told him before that the meeting started at 8:30 am.  Burke (male) laughed and stated that this was "like when your wife tells you an earlier time to be ready when you are planning on going out as she does not want you to be late."

[14]        When I asked Stevens (male) for permission to attend an Executive Leadership Institute for Women, Stevens responded: "go ahead and do your women's thing."

[15]        Stevens (male) told me that he did not have time for "stupid shit," like the unconscious bias training I participated in.

[16]        Stevens (male) told me that Jennifer Collins (female), Manager, resigned from Respondent for personal reasons, primarily because of her "mother's guilt," as she could not "handle working and taking care of her kids."

[17]        I have repeatedly expressed to Respondent that I want to be promoted to a Director position.  Respondent has failed to promote me to a Director position, despite my repeated requests, having taken on increased job duties and responsibilities, and being fully qualified to hold a Director position.

[18]        On or about September 23, 2015, in a meeting with Burke (male), I stated that I wanted to be promoted to a Director position.  Burke (male) acknowledged the good work that I do for Respondent and that I have not received credit for my increased workload and expanded job duties, but discounted my ability to be promoted to a Director position.

[19]     Effective May 15, 2016, Burke (male) was appointed Executive Vice President and Chief Financial Officer, and Montgomery was appointed Senior Vice President and Comptroller.

[20]     On or about May 18, 2017, in a meeting with Montgomery (male), I stated that I wanted to be promoted to a Director position. Montgomery (male) stated that I was a valuable member of the Finance department.

[21]     On or about December 12, 2017, in a meeting with Montgomery (male), I stated that less-tenured employees in other departments at Respondent are being promoted to Director positions and that I felt as though I was being held back as I had not yet been promoted to a Director position. Montgomery (male) responded that he cannot speak for other departments.

[22]     On or about April 17, 2018, in a meeting with Montgomery (male), I learned that Virelli (male) was promoted to Director. I asked why I was not promoted to Director. Montgomery (male) responded that we should talk about it later. I reiterated my desire and qualifications to be a Director. I stated that I did not feel supported by Respondent.

[23]     Respondent failed to promote me to the Director, Technical Accounting position for which I was qualified. I had no opportunity to apply for the promotion because the position was not posted. If the position had been posted, I would have applied for it. Instead of promoting me, Respondent promoted Virelli (male). The stated reason was that Virelli (male) had recently completed the ASC 606 Revenue Recognition project.

[24]     Respondent offered no explanation, including the selection criteria, as to why I was not selected and the male employee was selected for the position.

[25]     I was not promoted to Director because of my sex.

[26]     Before Virelli's promotion to Director, Virelli (male) and I had the same amount of time in a Senior Manager position.  I was more qualified than Virelli (male) for the promotion to Director in the following ways: written communication skills; ability to manage multiple people and tasks simultaneously; experience working on confidential items; timely delivering professional work products; approach to work products, challenges, and people; technical accounting research skills; reputation; precision; leadership; employee development; project management; decisiveness; and working well under pressure.

[27]     I am more qualified and experienced for the Director position than the male employee who was promoted instead of me.

[28]     On or about April 18, 2018, in a meeting with Stevens (male), I complained that I was not promoted to Director and Virelli (male) was promoted instead.  I stated that I was being passed over for promotions, despite my initiative and discussing my promotional goals with Stevens (male), Montgomery (male), and Burke (male).  Stevens (male) said that he had tried to talk to Montgomery about how it was unfair to promote Virelli (male) and not me, and that I deserved the promotion to Director more than Virelli (male).

[29]     On or about April 30, 2018, in a meeting with Gina Alm-Myers (female), Director of Corporate Human Resources, I complained that I was not promoted to Director and Virelli (male) was promoted instead.  I stated that I wanted to be promoted to a Director position, and that I have been passed over for promotion to a Director position, despite my qualifications.  I presented to Alm-Myers a departmental organizational chart and a timeline of my career and compensation changes compared to Virelli's career and compensation changes.  I also presented a plan of what my responsibilities would be if I were to be promoted to Director.  I stated that Respondent advertises that it wants diversity, and I want to be retained and promoted.

Alm-Myers instructed me not to compare myself to Virelli (male), to speak with Burke (male), and to tone down the message of my promotion request, as it was coming off demanding rather than humbly asking to work on a plan together with what Burke (male) and Montgomery (male) think is best. Alm-Myers stated that not everyone gets promoted. I stated that Stevens (male) told me that I deserved the Director promotion more than Virelli (male), and I reiterated my dedication to expanding responsibilities and special projects at Respondent.

[30]    On or about July 31, 2018, in separate meetings with Stevens (male) and Montgomery (male), I again stated that I wanted to be promoted to a Director position. I reiterated my qualifications, expanded job duties and responsibilities, and special projects I had recently completed and was then working on. I expressed an interest in applying for the open Corporate Director, Executive Compensation position, as Cindy Goodeman (female) had recently been terminated. Stevens stated that he did not know that Goodeman (female) had been terminated, and that he is in support of my promotion but cannot get Burke (male) and Montgomery (male) to agree to promote me. Montgomery (male) stated that I would not be able to apply for the Corporate Director, Executive Compensation position; Montgomery (male) stated that Matthew Conti (male), Vice President, Human Resources, was going in another direction with the position.

[31]    On or about September 5, 2018, in a meeting with Stevens (male), I was told that my work and effort was not at the Director level. This is false. I was told I needed more exposure to Executive Officers to be promoted. Respondent did not assist me in gaining exposure to Executive Officers and assisted male employees, including Virelli (male), in gaining exposure to Executive Officers.

[32]      I was told that my work and effort was not at the Director level.  This is false and pretext for sex discrimination and/or retaliation because of my complaints of sex discrimination.

[33]      I was not assisted in gaining exposure to Executive Officers because of my sex and/or my complaints of sex discrimination.

[34]      On or about September 10, 2018, Respondent failed to promote me to the Corporate Director, Executive Compensation position.  I had no opportunity to apply for the promotion because the position was not posted.  If the position had been posted, I would have applied for it.  I was qualified for the position.  Instead of promoting me, Respondent selected Todd Henderson (male), an external candidate.  The stated reason was that Respondent was going in another direction with the position.

[35]      Respondent's stated reason is pretext for sex discrimination and/or retaliation because of my complaints of sex discrimination.

[36]      I was not promoted to Corporate Director because of my sex and/or my complaints of sex discrimination.

[37]      Respondent has failed to compensate me as much as it compensates male employees, including Virelli (male).  Since at least 2015, Respondent has awarded Virelli (male) more Long Term Incentive Equity-Based Grants, including restricted stock awards and stock options, than Respondent has awarded me.

[38]      Respondent has failed to compensate me as much as it compensates male employees, including Virelli (male), because of my sex.

[39]      I have had no performance or disciplinary issues during my employment with Respondent.

[40]      Respondent has failed to promote me, failed to compensate me as much as male employees in my position are compensated, and subjected me to a hostile work environment because of my sex and/or my complaints of sex discrimination.

[41]      Respondent's sex discriminatory and retaliatory conduct toward me has caused me economic harm.

[42]      Respondent's sex discriminatory and retaliatory conduct toward me has caused me emotional distress, for which I am receiving treatment.

[43]      As a result of the sex discrimination and retaliation to which I have been subjected at Respondent, I have been forced to take a medical leave of absence.  I remain on a medical leave of absence.

[44]      Respondent has an underrepresentation of female employees in high-level positions.

[45]      Respondent's seven- (7) member Management Team is comprised of only male employees.

[46]      The number of female employees decreases with each consecutive higher-level position.  For example, there are fewer female employees in a Director position than a Supervisor position, and fewer female employees in a Vice President position than a Director position.

[47]      Respondent's comments and conduct evidence a bias against female employees.

[48]      **I bring this Complaint as a class and pattern and practice Complaint on behalf of myself and any and all current or former employees of Respondent who are**

**female, and have been discriminated against based on sex, in connection with failure to be promoted, compensation, termination, and being subjected to a hostile work environment.**

      **B.**  Based on the aforementioned, I allege that Respondent has discriminated against me because of my sex (female), and retaliated against me because of my complaints of sex discrimination, in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq.* ("Title VII"), the Equal Pay Act, 29 U.S.C. § 206 *et seq.* ("EPA"), and the Pennsylvania Human Relations Act, as amended, 43 P.S. § 951, *et seq.* ("PHRA").

4.     The allegations in Paragraph 3 hereof constitute unlawful discriminatory and retaliatory practices in violation of:

    **X**       **Pennsylvania Human Relations Act (Act of October 27, 1955, P.L. 744, as amended) Section 5 Subsection(s):  (a); (d)**

    \_\_\_\_       Section 5.1 Subsection(s) _____

    \_\_\_\_       Section 5.2 Subsection(s) _____

    \_\_\_\_       Pennsylvania Fair Educational Opportunities Act (Act of July 17, 1961, P.L. 766, as amended) Section 4 Subsection(s) _____

5.     Other action based upon the aforesaid allegations has been instituted by the Complainant in any court or before any other commission within the Commonwealth of Pennsylvania as follows:

    **X**       **This charge will be referred to the EEOC for the purpose of dual filing.**

6.     The Complainant prays that Respondent be required to:

(a) Make the Complainant whole.

(b) Eliminate all unlawful discriminatory and retaliatory practice(s) and procedure(s).

(c) Remedy the discriminatory and retaliatory effect of past practice(s) and procedure(s).

(d) Take further affirmative action necessary and appropriate to remedy the violation complained of herein.

(e) Provide such further relief as the Commission deems necessary and appropriate.

## **VERIFICATION**

I hereby verify that the statements contained in this complaint are true and correct to the best of my knowledge, information, and belief. I understand that false statements herein are made subject to the penalties of 18 P.A.C.A. Section 4904, relating to unsworn falsification to authorities.

_1/7/2019_
(Date Signed)

_Amy Brown_
(Signature)   Amy Brown
REDACTED

EXHIBIT 2

EEOC Form 161-B (11/16)

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**

## NOTICE OF RIGHT TO SUE *(ISSUED ON REQUEST)*

| | |
|---|---|
| To: **Amy Brown**<br>REDACTED | From: **Philadelphia District Office**<br>**801 Market Street**<br>**Suite 1300**<br>**Philadelphia, PA 19107** |

☐  *On behalf of person(s) aggrieved whose identity is CONFIDENTIAL (29 CFR §1601.7(a))*

| EEOC Charge No. | EEOC Representative | Telephone No. |
|---|---|---|
| | **Kurt Jung** | |
| **17F-2020-60269** | **State, Local & Tribal Program Manager** | **(267) 589-9749** |

*(See also the additional information enclosed with this form.)*

**NOTICE TO THE PERSON AGGRIEVED:**

**Title VII of the Civil Rights Act of 1964, the Americans with Disabilities Act (ADA), or the Genetic Information Nondiscrimination Act (GINA):** This is your Notice of Right to Sue, issued under Title VII, the ADA or GINA based on the above-numbered charge.  It has been issued at your request.  Your lawsuit under Title VII, the ADA or GINA **must be filed in a federal or state court UNDERLINE WITHIN 90 DAYS of your receipt of this notice**; or your right to sue based on this charge will be lost.  (The time limit for filing suit based on a claim under state law may be different.)

☒  More than 180 days have passed since the filing of this charge.

☐  Less than 180 days have passed since the filing of this charge, but I have determined that it is unlikely that the EEOC will be able to complete its administrative processing within 180 days from the filing of this charge.

☒  The EEOC is terminating its processing of this charge.

☐  The EEOC will continue to process this charge.

**Age Discrimination in Employment Act (ADEA):** You may sue under the ADEA at any time from 60 days after the charge was filed until 90 days after you receive notice that we have completed action on the charge.  In this regard, **the paragraph marked below applies to your case:**

☐  The EEOC is closing your case.  Therefore, your lawsuit under the ADEA **must be filed in federal or state court WITHIN 90 DAYS of your receipt of this Notice.**  Otherwise, your right to sue based on the above-numbered charge will be lost.

☐  The EEOC is continuing its handling of your ADEA case.  However, if 60 days have passed since the filing of the charge, you may file suit in federal or state court under the ADEA at this time.

**Equal Pay Act (EPA):**  You already have the right to sue under the EPA (filing an EEOC charge is not required.)  EPA suits must be brought in federal or state court within 2 years (3 years for willful violations) of the alleged EPA underpayment.  This means that **backpay due for any violations that occurred more than 2 years (3 years)** before you file suit may not be collectible.

If you file suit, based on this charge, please send a copy of your court complaint to this office.

On behalf of the Commission

*[signature]*                                                                                          **02/14/2020**

**Jamie R. Williamson**                                                          *(Date Mailed)*
**District Director**

Enclosures(s)

cc:    **AMETEK, INC.**

**Emily R. Derstine Friesen, Esq.**
**Console Mattiacci Law**
**1525 Locust Street, 9th Floor**
**Philadelphia, PA 19102**
**derstinefriesen@consolelaw.com**

**Susan K. Lessack, Esq.**
**Pepper Hamilton LLP**
**400 Berwyn Park**
**899 Cassatt Road**
**Berwyn, PA 19312**
**lessacks@pepperlaw.com**

Enclosure with EEOC
Form 161-B (11/16)

# INFORMATION RELATED TO FILING SUIT
# UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court <u>under Federal law</u>.
If you also plan to sue claiming violations of State law, please be aware that time limits and other
provisions of State law may be shorter or more limited than those described below.)*

**PRIVATE SUIT RIGHTS   --   Title VII of the Civil Rights Act, the Americans with Disabilities Act (ADA),
the Genetic Information Nondiscrimination Act (GINA), or the Age
Discrimination in Employment Act (ADEA):**

In order to pursue this matter further, you must file a lawsuit against the respondent(s) named in the charge **within
90 days** of the date you *receive* this Notice. Therefore, you should **keep a record of this date**. Once this 90-
day period is over, your right to sue based on the charge referred to in this Notice will be lost. If you intend to
consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and its envelope, and tell
him or her the date you received it. Furthermore, in order to avoid any question that you did not act in a timely
manner, it is prudent that your suit be filed **within 90 days of the date this Notice was *mailed* to you** (as
indicated where the Notice is signed) or the date of the postmark, if later.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. (Usually, the appropriate
State court is the general civil trial court.) Whether you file in Federal or State court is a matter for you to decide
after talking to your attorney. Filing this Notice is not enough. You must file a "complaint" that contains a short
statement of the facts of your case which shows that you are entitled to relief. Courts often require that a copy of
your charge must be attached to the complaint you file in court. If so, you should remove your birth date from the
charge. Some courts will not accept your complaint where the charge includes a date of birth. Your suit may include
any matter alleged in the charge or, to the extent permitted by court decisions, matters like or related to the matters
alleged in the charge. Generally, suits are brought in the State where the alleged unlawful practice occurred, but in
some cases can be brought where relevant employment records are kept, where the employment would have
been, or where the respondent has its main office. If you have simple questions, you usually can get answers from
the office of the clerk of the court where you are bringing suit, but do not expect that office to write your complaint
or make legal strategy decisions for you.

## PRIVATE SUIT RIGHTS   --   Equal Pay Act (EPA):

EPA suits must be filed in court within 2 years (3 years for willful violations) of the alleged EPA underpayment: back
pay due for violations that occurred **more than <u>2 years (3 years)</u> before you file suit** may not be collectible. For
example, if you were underpaid under the EPA for work performed from 7/1/08 to 12/1/08, you should file suit
<u>before 7/1/10</u> – *not* 12/1/10 -- in order to recover unpaid wages due for July 2008. This time limit for filing an EPA
suit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above.
Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA
claim, suit must be filed within 90 days of this Notice <u>and</u> within the 2- or 3-year EPA back pay recovery period.

## ATTORNEY REPRESENTATION   --   Title VII, the ADA or GINA:

If you cannot afford or have been unable to obtain a lawyer to represent you, the U.S. District Court having jurisdiction
in your case may, in limited circumstances, assist you in obtaining a lawyer. Requests for such assistance must be
made to the U.S. District Court in the form and manner it requires (you should be prepared to explain in detail your
efforts to retain an attorney). Requests should be made well before the end of the 90-day period mentioned above,
because such requests do <u>not</u> relieve you of the requirement to bring suit within 90 days.

## ATTORNEY REFERRAL AND EEOC ASSISTANCE   --   All Statutes:

You may contact the EEOC representative shown on your Notice if you need help in finding a lawyer or if you have any
questions about your legal rights, including advice on which U.S. District Court can hear your case. If you need to
inspect or obtain a copy of information in EEOC's file on the charge, please request it promptly in writing and provide
your charge number (as shown on your Notice). While EEOC destroys charge files after a certain time, all charge files
are kept for at least 6 months after our last action on the case. Therefore, if you file suit and want to review the charge
file, **please make your review request <u>within 6 months</u> of this Notice.** (Before filing suit, any request should be
made within the next 90 days.)

*IF YOU FILE SUIT, PLEASE SEND A COPY OF YOUR COURT COMPLAINT TO THIS OFFICE.*

Enclosures(s)

cc: